

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-22-00043-CV

---

## IN THE INTEREST OF E.D.S., A CHILD

---

On Appeal from the 100th Judicial District Court
Childress County, Texas
Trial Court No. 11179, Honorable Stuart Messer, Presiding

---

May 11, 2022

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and DOSS, JJ.

Appellant, J.R.S. (Father), appeals from a final order terminating his parental rights to E.D.S.[1]  Appellee is the Texas Department of Family and Protective Services.  The Department's case was heard via Zoom before the associate judge over settings of November 2, November 18, and December 7, 2021.  At Father's request, a de novo hearing before the referring district court was conducted on January 6, 2022.  Through a

---

[1] To protect the privacy of the parties involved, we will refer to J.R.S. as "Father," and the child by initials.  See TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).  The parental rights of E.D.S.'s mother, G.M.S. (Mother), were terminated in the same proceeding and she did not appeal the final order.  See TEX. FAM. CODE ANN. § 161.001(b)(1)(K) (affidavit of relinquishment of parental rights) and (2) (termination in best interest).

single issue, Father challenges the sufficiency of the evidence supporting the referring court's finding that terminating Father's parental rights is in E.D.S.'s best interest. We conclude that finding is supported by legally and factually sufficient evidence. The final order is affirmed.

## Background

Department investigator Brandy Pate testified that on November 30, 2020, the Department received a report of neglectful supervision of E.D.S. due to possible drug use by Mother. After learning Mother was evicted from her apartment, Pate viewed the premises. She described it as dirty and cluttered.

Pate obtained a new address for Mother and found Mother, Father, and E.D.S. there. According to Pate, Mother did not look healthy, appearing "very thin" and as though she had not bathed or showered for some time. Mother admitted using methamphetamine the previous day and marijuana recently. Father told Pate he had used methamphetamine "off and on" for some twenty years. He also appeared very thin and unkempt, acknowledging he had last used methamphetamine the previous day. E.D.S., according to Pate, appeared dirty with long, matted, and tangled hair.

At final hearing, the court admitted the family service plan over no objection. The plan stated, *inter alia*, that Mother and Father exposed E.D.S. to methamphetamine, and that the child tested positive for the drug. With apparent regard for E.D.S.'s drug exposure, the plan indicated the Department intended to continue monitoring the child's kidneys and lungs. The plan added that "two crack rocks [were] found in [E.D.S.'s] bedroom."

2

Under a heading titled, "Intimate Partner Violence," the plan stated that Mother had "notable red marks on her neck" and on "multiple occasions" had called the police on Father. Father also reportedly "had scratch marks on his neck." In the plan, the Department expressed its concern about Mother and Father "continuing in domestic violence patterns," where the child is "left unsupervised and can lead to [the child] being seriously injured, emotionally distressed, and his basic needs being neglected." According to the plan, Father and Mother each denied any episodes of domestic violence after resuming cohabitation.

Father was called adversely by the Department during its case-in-chief. He testified his last full-time employment was June or July 2021, although he said he performed tattooing and piercings for remuneration "all the time," and earned from $700 to $2,500 per month. Father also stated he had a "guaranteed job" at $18 per hour as a butcher at Tyson Foods with a commencement date depending on whether he was admitted to a drug rehab program. At the third setting of final hearing, Father related he was cleaning rest stops for $600 a week. The purpose of that job, he explained, was to repair his vehicle. Father then expressed the intention to begin employment for Tyson. The family service plan also mentioned Father's anticipated enlistment in the Navy, but that prospect was not discussed at final hearing.

Father expressed the intention that his mother would care for E.D.S. when Father worked. Father indicated E.D.S. received Medicaid, but that future health insurance would be provided through the job Father planned to take with Tyson Foods.

Regarding housing, Father's former landlord testified she directed Father to leave the apartment he rented with Mother because "[i]t was filthy, disaster, tore up." Elsewhere, the landlord described the apartment as a "disaster, it was destroyed," showing holes in the floor and front door, "garbage everywhere," and syringes. Another witness who photographed the interior of the apartment at the time of Father's departure described the bathroom as "absolutely disgusting, had dog feces and urine all over. Random trash all over." One photograph depicted a cylindrical object that the witness opined was a pipe containing residue. Another photograph depicted a dead fox found in the apartment's freezer. Father explained he had an apprenticeship in taxidermy and decided to "taxidermy it" after striking the fox with his vehicle.

Father's present and future living arrangements were unclear at best. At the first setting, Father testified he was in the process of moving to another location; a place he variously described as a one-bedroom "back house," a "temporary house," and a house he could remodel. He said he planned to stay with a friend until moving. At another point, Father said that once he was in the one-bedroom house, if E.D.S. lived with him, Father would sleep on the couch. However, Father later testified he was living with his friend because the house where he intended to move "burned to the ground." At the de novo hearing, Father testified he was living in a two-bedroom camper in an RV park. Father indicated he would stay with a friend in a suitable home should he gain conservatorship over E.D.S.

Father also used methamphetamine while E.D.S. was in Department custody. Father said he last used methamphetamine about three months before the first setting as a means of coping with depression at the suicide of his former wife and death of a

4

grandparent.  Department caseworker, Tippi Watson, testified of a September 30, 2021 meeting with Father, where he admitted using methamphetamine on his birthday earlier that same month.  Watson also testified about a drug test from November 10, 2021, that was positive for methamphetamine; the reported quantity of drugs found in Father's system led Watson to opine that Father had used methamphetamine less than twenty-four hours before the test.

Father acknowledged he could obtain methamphetamine if he wanted but claimed no desire to do so.  Father agreed it was not in the best interest of E.D.S. to have a parent who struggled with methamphetamine use but denied a present problem.

Watson testified Father initially did "very well" when visiting the child.  However, Father began to pay less attention as the case progressed.  According to Watson, Father "would allow the child to do things that weren't safe, such as running around the room, standing on the table, jumping off, rough play with him . . . .  Running out of the room." Father said his visitation with E.D.S. was suspended until he could "pass a drug test." Watson agreed, noting Father's visits remained suspended because he had not provided a negative drug test result.  After Father's visits with the child were suspended, he did not ask to see E.D.S.

At the first setting, Father acknowledged having been arrested for the offense of burglary of a habitation.  Father testified his belief that the charge would be dropped.

Father is the parent of four children under age eighteen.  Although the reasons were unclear from the record, Father's parental rights to two other children were also recently terminated in a Potter County court.  The court found termination was in the best

5

interest of the children and Father had engaged in endangering conduct,[2] constructively abandoned the children, and failed to work court-ordered family services. The family service plan suggests Father's loss of parental rights for those children was "due to methamphetamine use." Father also acknowledges a girlfriend despite still being married to Mother.

Regarding Father's efforts to complete services ordered by the court and the Department's plan, Watson testified (1) Father never made an appointment for individual counseling; (2) never provided proof of work in a tire shop, which he claimed; (3) never produced an offer letter proving his "guaranteed job" at Tyson Foods; (4) never offered Watson proof of housing; (5) never allowed Watson access into his home; (6) failed to complete an OSAR (Outreach, Screening, Assessment, and Referral) evaluation;[3] (7) never completed a parenting program; (8) never completed a batterers intervention and prevention program; and (9) never completed a psychosocial evaluation. Moreover, Father did not participate in drug screenings on five occasions. Father likewise did not participate in Alcoholics Anonymous or complete an inpatient or outpatient drug treatment program. Watson said Father was difficult to contact because he did not have a physical address and did not respond to telephone and text messages. Department supervisor Jessica Hoskins testified that because Father's service plan in the present case was identical to the one in the Potter County matter, Father had roughly two years to complete

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[3] Watson testified Father's scheduled appointment for the telephonic evaluation was February 17, 2021. Father testified that date was during a weather-related, three-day power outage in Childress. According to Father, he was unable to receive the evaluator's call because his cellphone battery was dead, and he had no means of recharging. Watson also testified that Father never called to reschedule the appointment. According to Father he attempted to reschedule the appointment through his original caseworker but "she kept putting it off."

services. Father's alleged excuses for failing to complete certain services included inclement weather, one inpatient treatment program's alleged prohibition of piercings and tattoos and requirement that he wear pants, and another inpatient program's unacceptability because "they injured his foot."

The trial court also heard Father provide numerous explanations for why he failed to complete his services. First, Father said he would have adequately complied with the services requirement had he received the assistance of another caseworker; he complained about the unavailability of caseworkers. Nevertheless, at least three Department caseworkers had case oversight during the pendency of this case. Second, Father testified that in December 2020 or January 2021 he was discharged from an inpatient rehab facility after two days due to testing positive for Covid-19. Another facility told Father it was "booked up" and that he should look elsewhere. Third, Father said he did not take independent parenting classes because that curriculum was also included in a rehab program. Father acknowledged failing to complete a rehab program before the third setting of final hearing. Fourth, Father said he did not offer Watson the opportunity to view his apartment because at the time he was packing and moving his belongings to storage. Fifth, he blamed the sponsoring witness of the apartment photographs for incorrectly stating the date the photographs were made. At the de novo hearing the court admitted on Father's offer photographs of the apparent interior bearing an earlier date stamp. Sixth, Father said the photograph of syringes belonged to another person who was jailed as a result. Seventh, Father opined his positive drug test in November 2021 was due to his consumption of supplements and prescription medication.

7

The Department expressed its goal to seek adoption of E.D.S. by his maternal great-grandmother. Such an arrangement, Watson testified, would place E.D.S. in the care of a blood relative along with two half-siblings.

On December 14, 2021, the associate judge signed an order terminating Father's parental rights to E.D.S. after making findings under Family Code section 161.001(b)(1), predicate grounds (D), (E), (M), (N), (O), and (P), and finding that termination was in the child's best interest.[4] As noted, Father requested a de novo hearing before the referring court.[5]

At the January 6, 2022, de novo hearing, the referring court without objection stated it would consider the record from the three prior settings before the associate judge. It also heard Father's brief testimony and admitted some exhibits offered by Father.

In an order signed January 12, 2022, the referring court terminated Father's parental rights to E.D.S., making predicate ground and best interest findings identical to those of the associate judge. Father's notice of appeal was filed February 10, 2022; the deadline was extended by Appellate Rule 26.3.[6]

---

[4] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (M), (N), (O), and (P) and (2).

[5] See TEX. FAM. CODE ANN. §§ 201.2042(a) & 201.015.

[6] *See* TEX. R. APP. P. 26.3, 28.1(a),(b), 26.1(b), & 25.1.

**Analysis**

Through one issue, Father challenges the sufficiency of the evidence supporting the referring district court's best-interest finding. He seeks a new trial.

The Due Process Clause of the United States Constitution and section 161.001 of the Texas Family Code require application of the heightened standard of clear and convincing evidence in cases involving involuntary termination of parental rights. *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002). The applicable standards for reviewing the evidence are discussed in our opinion in *In re A.M.,* No. 07-21-00052-CV, 2021 Tex. App. LEXIS 5447 (Tex. App.—Amarillo July 8, 2021, pet. denied) (mem. op.). As factfinder, the district court was the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *In re H.E.B.,* No. 07-17-00351-CV, 2018 Tex. App. LEXIS 885, at *5 (Tex. App.—Amarillo Jan. 31, 2018, pet. denied) (mem. op.). Unchallenged statutory predicate ground findings can support the trial court's best-interest finding. *In re M.D.,* No. 07-21-00149-CV, 2021 Tex. App. LEXIS 7217, at *1-2 (Tex. App.—Amarillo Aug. 30, 2021, pet. denied) (per curiam, mem. op.); *see also In re T.C.,* No. 07-18-00080-CV, 2018 Tex. App. LEXIS 6769, at *13 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.) (noting that a parent who opts to forgo a challenge to predicate ground findings tacitly concedes that sufficient evidence supports those findings).

To assess the trial court's best-interest determination, we may consider the factors itemized in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex.1976).[7] While the *Holley* list

---

[7] The *Holley* factors are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

"is by no means exhaustive, [it] does indicate a number of considerations which either have been or would appear to be pertinent." *Holley,* 544 S.W.2d at 372.[8] "The absence of evidence about some of these considerations would not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.,* 89 S.W.3d 17, 27 (Tex. 2005). In some circumstances, evidence of even one *Holley* factor may be sufficient. *Jordan v. Dossey,* 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d at 116. But prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). The best-interest analysis evaluates the best interest of the child, not the parent. *In re A.C.B.,* 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.). "A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.,* 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.).

---

parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley,* 544 S.W.2d at 371-72.

[8] *See In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Family Code section 263.307 ["Factors in Determining Best Interest of Child"] and *Holley* as providing factors for consideration "when determining whether termination of parental rights is in the best interest of the child" and also referencing Family Code section 153.131(b) which provides "a strong presumption that the best interest of a child is served by keeping the child with a parent.").

The Department's goal was for E.D.S. to be adopted by a blood relative. Whether viewed in the light most favorable to the district court's order (legal sufficiency) or in a neutral light (factual sufficiency), the evidence demonstrates remarkable instability in Father's life and of Father's inability to provide a safe, drug-free home environment. The evidence shows Father's unbroken history of drug use, choices that exposed E.D.S. to methamphetamine, cycle of domestic violence, unstable housing and employment, failure to work court-ordered services, endangering conduct, prior removal and termination of parental rights to two other children, constructive abandonment of E.D.S., and lack of any meaningful plan for nurturing and caring for E.D.S. All of this solidly supports the district court's best-interest determination. Moreover, the district court was empowered to reject Father's myriad excuses and blame-shifting. We conclude the evidence supporting the finding that termination of Father's parental rights was in the best interest of E.D.S. was both legally and factually sufficient. Father's issue is overruled.

Conclusion

The final order of the referring district court is affirmed.


Lawrence M. Doss
Justice